# In the United States Court of Federal Claims

No. 10-734T

Filed: April 18, 2012

**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| \* | Bankruptcy Act, 11 U.S.C. §§ 701-85 (2006); |
| \* | Federal Deposit Insurance Act, 12 U.S.C. § |
| \* | 1821(d)(11)(A)(ii) (2006) (authorizing the |
| \* | Federal Deposit Insurance Corporation to |
| \* | act as a receiver); |
| \* | Home Owners Loan Act, 12 U.S.C. § |
| \* | 1464(d)(2)(A) (2006); |
| \* | Net Operating Loss; |
| \* | Tax Refund; |
| \* | Worker, Homeownership and Business |
| \* | Assistance Act of 2009, Pub. L. No. 111- |
| \* | 92, 123 Stat. 29840 (2009); |
| \* | 26 U.S.C. § 165(g) (2006) (Ordinary Loss); |
| \* | 26 U.S.C. §§ 1501-02 (2006) (parent of a |

MONTAGUE S. CLAYBROOK, in his
capacity as the Chapter 7 Trustee for the
Estate of DOWNEY FINANCIAL CORP.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

| | |
|---|---|
| \* | consolidated tax group); |
| \* | 26 U.S.C. § 6402(a) & (k) (2006 & Supp. III |
| \* | 2009) (federal tax refund may be paid to a |
| \* | fiduciary of an insolvent corporation); |
| \* | 26 U.S.C. 6511 (a) (2006) (statute of |
| \* | limitations for filing a federal tax refund); |
| \* | 26 U.S.C. § 6611 (2006) (Statutory Interest); |
| \* | 26 U.S.C. § 7422(a) (2006) (jurisdictional |
| \* | requirement before seeking an |
| \* | adjudication of a federal tax refund); |
| \* | Treas. Reg. § 1.1502-77(a) (2011) (the |
| \* | common parent for a consolidated return is |
| \* | the sole agent for each member of a |
| \* | consolidated tax group); |
| \* | Treas. Reg. § 301.6402-7 (2011) (permitting |
| \* | fiduciaries of insolvent financial |
| \* | institutions to file alternate tax returns); |
| \* | RCFC 19, Motion For Joinder; |
| \* | RCFC 24, Motion To Intervene; |
| \* | Form 1120X (Amended Claims For Refund); |
| \* | Form 1139 (Application for Tentative |
| \* | Refund). |
| \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Jerald David August**, **Peter C. Buckley**, **William H. Stassen**, **Raymond M. Patella**, Fox Rothschild LLP, Philadelphia, Pennsylvania, Counsel for Plaintiff.

**Fredrick C. Crombie**, **John A. DiCicco**, **Steven I. Frahm**, **G. Robson Stewart**, United States Department of Justice, Washington, D.C., Counsel for Defendant.

**Melanie L. Cyganowski**, **Peter Feldman**, **Lloyd M. Green**, Otterbourg, Steindler, Houston, and Rosen, P.C., New York, New York, Counsel for Intervenor.

### MEMORANDUM OPINION AND ORDER REGARDING THE FEDERAL DEPOSIT INSURANCE CORPORATION'S MOTION TO INTERVENE, AS RECEIVER, AND THE GOVERNMENT'S MOTION FOR JOINDER.

**BRADEN**, *Judge*.

The pending motions concern whether the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver ("FDIC-R"), is entitled to intervene in this federal tax refund case or should be joined as a party.

## I.   RELEVANT FACTS.[1]

Downey Financial Corporation ("DFC"), a Delaware corporation, is the parent of a Consolidated Tax Group, formed pursuant to 26 U.S.C. §§ 1501-02 (the "Consolidated Tax Group"). Compl. ¶¶ 1, 8. DFC is also the sole shareholder and owner of Downey Savings & Loan Association ("DSL"), a member of the Consolidated Tax Group.[2] Compl. ¶ 8. Since December 31, 1995, DFC has filed consolidated federal income tax returns with the Internal Revenue Service ("IRS") on behalf of DSL and other members of the Consolidated Tax Group. Compl. ¶¶ 9-10.

On February 29, 2000, DFC, DSL, and the other members of the Consolidated Tax Group signed an amended private Tax Sharing Agreement (the "Tax Sharing Agreement"), under which DFC was afforded "sole discretion" as to when and how to file federal income tax returns on behalf of the Consolidated Tax Group. FDIC-R Mot., Ex. C ¶ 2.4(a). Pursuant to that Tax Sharing Agreement, from 2003 to 2008, DFC filed federal income tax returns with the IRS on behalf of the Consolidated Tax Group and paid all amounts due in full. Compl. ¶¶ 13, 57, 67, 77,

---

[1] The relevant facts recited herein are derived from Plaintiff's October 29, 2010 Complaint filed in the United States Court of Federal Claims ("Compl."), and attachments thereto; the Government's April 1, 2011 Motion For Joinder ("Gov't Mot."), and attachments thereto; and the FDIC-R's July 12, 2011 Motion To Intervene ("FDIC-R Mot."), and attachments thereto, including Exhibit A (FDIC-R's Proposed Complaint ("FDIC-R Compl.")).

[2] Several other corporate entities owned by DFC also were members of the Consolidated Tax Group, but those entities are not parties to this proceeding, *i.e.*, DSL Service Company, Downey Auto Finance Corp., Downey Affiliated Insurance Agency, and DSL/Sierra Vista, Inc. Compl. ¶ 8; FDIC-R Mot., Ex. C.

87, 97.[3]  During that time, DSL generated "all or substantially all" of the Consolidated Tax Group's income.  FDIC-R Compl. ¶ 12.

On November 21, 2008, the United States Department of Treasury's Office of Thrift Supervision ("OTS") determined that, because of the number of risky adjustable rate mortgages held by DSL, it "has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for the institution to become adequately capitalized without Federal assistance."  OTS Order No. 2008-49, 2008 WL 4989081 (Nov. 21, 2008) (reproduced at FDIC-R Mot., Ex. B at 5).  Accordingly, pursuant to the Federal Deposit Insurance Act, 12 U.S.C. § 1821(c)(5) (2006) and the Home Owners Loan Act, 12 U.S.C. § 1464(d)(2)(A) (2006), OTS closed DSL's banking and business operations and transferred ownership of DSL's assets to the FDIC-R.  OTS Order No. 2008-49, 2008 WL 4989081.  On the same day, more than $12 billion of DSL's assets were sold to U.S. Bank National Association ("U.S. Bank").  Gov't Mot., Ex. 3 at 000046.  As part of the transaction and to induce U.S. Bank to enter into the purchase agreement, the FDIC-R and U.S. Bank entered into a loss-sharing agreement.  Gov't Mot., Ex. 3 at 000046.  Thereunder, U.S. Bank committed to assume the first $1.5 billion of DSL's expected losses; the FDIC-R promised to assume a certain portion of any remaining losses.  Gov't Mot., Ex. 3 at 000046.  As of November 21, 2008, the FDIC-R estimated that the FDIC's Deposit Insurance Fund ("DIF") would be liable for $1.4 billion of DSL's losses.  Gov't Mot., Ex. 2 at 000040.[4]  The FDIC-R, however, has retained certain assets

---

[3] On September 14, 2004, DFC filed a federal income tax return for the Consolidated Tax Group for the tax year 2003.  Compl. ¶ 55.  After DFC amended this filing, the Consolidated Tax Group's taxable income was reported as $112,119,042, on which federal income taxes of $39,129,059 were owed.  Compl. at ¶ 56.

On September 14, 2005, DFC filed a federal income tax return for the Consolidated Tax Group for the tax year 2004.  Compl. ¶ 65.  After DFC amended this filing, the Consolidated Tax Group's taxable income was reported as $95,771,790, on which federal income taxes of $33,392,020 were owed.  Compl. at ¶ 66.

On September 6, 2006, DFC filed a federal income tax return for the Consolidated Tax Group for the tax year 2005.  Compl. ¶ 75.  After DFC amended this filing, the Consolidated Tax Group's taxable income was reported as $350,606,594, on which federal income taxes of $122,517,866 were owed.  Compl. ¶ 76.

On September 7, 2007, DFC filed a federal income tax return for the Consolidated Tax Group for the tax year 2006.  Compl. ¶ 85.  After DFC amended this filing, the Consolidated Tax Group's taxable income was reported as $325,577,876, on which federal income taxes of $113,667,572 were owed.  Compl. ¶ 86.

On September 8, 2008, DFC filed a federal income tax return for the Consolidated Tax Group for the tax year 2007.  Compl. ¶ 95.  After DFC amended this filing, the Consolidated Tax Group's taxable income was reported as $116,697,275, on which federal income taxes of $40,338,678 were owed.  Compl. ¶ 96.

[4] The FDIC administers the DIF in its corporate capacity ("FDIC-C").  The DIF is funded by premiums paid by private insured banking institutions, but any losses incurred by the DIF are offset whenever the FDIC-R recovers funds.  See 12 U.S.C. § 1821(g) (2006).  Pursuant to 12 U.S.C. § 1821(d)(11)(A)(ii), the FDIC-R is required first to pay the DIF any recovered funds before paying other non-secured creditors of the distressed financial institution.

to offset these potential losses, including "the rights to any and all tax refunds to which [DSL] is entitled." FDIC-R Mot. at 4.

## II.   PROCEDURAL HISTORY IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE.

On November 25, 2008, DFC filed a voluntary Petition for liquidation, pursuant to 11 U.S.C. §§ 701-85, in the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"). *See In re Downey Financial Corp.*, Bk. No. 08-13041-CSS, Docket No. 1 (Bankr. D. Del. Nov. 25, 2008). On November 26, 2008, the Bankruptcy Court appointed Montague S. Claybrook as Trustee for DFC's estate ("the Trustee"). Compl. ¶ 2.

On September 15, 2009, the Trustee electronically filed a consolidated federal income tax return for the tax year 2008 for the Consolidated Tax Group with the IRS ("2008 Consolidated Return"). Compl. ¶ 32; *see also* Compl., Ex. A (the 2008 Consolidated Return). The IRS received the 2008 Consolidated Return the same day. Compl. ¶ 33.

The 2008 Consolidated Return set forth two separate grounds for a federal tax refund. First, DFC claimed an "ordinary loss" of $1,750,597,505, pursuant to I.R.C. § 165(g)(3) (2006), attributable to lost value of DSL stock held by DFC, caused by DSL's being placed into receivership (*i.e.*, the "Worthless Stock Loss" theory). Compl. ¶¶ 13, 25; Compl., Ex. A at 8, l.23f. Subsequently, this loss was adjusted downwards by the Trustee to $1,592,067,979. Compl. ¶ 26. In the alternative, the 2008 Consolidated Return claimed that DSL incurred net operating losses of $1,617,774,904 in 2008 (*i.e.*, the "Net Operating Loss" theory). Compl. ¶¶ 14, 29-30.

On September 16, 2009, the Trustee filed an IRS Form 1139, Application for Tentative Refund, to carry back DSL's net operating losses for two years, in the event that the IRS approved the 2008 Consolidated Return. Compl. ¶ 15; Compl., Ex. B. Specifically, the Trustee claimed a carryback of $107,170,297 for tax year 2006 and $38,009,110 for tax year 2007, resulting in a total refund claim due of $145,179,407, plus statutory interest. Compl. ¶ 15; Compl., Ex. B at 1, l.27.

On October 29, 2009, the FDIC-R filed a Proof Of Claim in the Bankruptcy Court, asserting several claims against DFC. FDIC-R Mot., Ex. H. One claim concerned the FDIC-R's entitlement to any tax refund owed to DFC, as parent of the Consolidated Tax Group, as a result of losses attributed to DSL. FDIC-R Mot., Ex. H ¶¶ 13-23.

On November 6, 2009, Congress enacted the Worker, Homeownership and Business Assistance Act, extending the loss carryback provisions of the Internal Revenue Code from two years to five years. *See* Pub. L. No. 111-92 § 13, 123 Stat. 2984 (2009). To take advantage of this law, on December 31, 2009, the Trustee filed an amendment to the 2008 Consolidated Return, by filing five Form 1120X Amended Claims for Refunds on behalf of the Consolidated

Tax Group for the tax years 2003-2007.  Compl. ¶¶ 34, 36, 38, 40, 42.  The amended amount of the claimed overpayments was $312,955,826, plus statutory interest.[5]

On January 6, 2010, the IRS received the Trustee's December 31, 2009 Amended Claims for Refunds.  Compl. ¶¶ 35, 37, 39, 41, 43.

On March 17, 2010, the Bankruptcy Court approved a Supplemental Stipulation between the FDIC-R and the Trustee, providing that any tax refund recognized by the IRS will be paid to the Trustee and deposited into an escrow account until the Bankruptcy Court makes a final ownership determination.  FDIC-R Mot., Ex. I ¶ 4.  The Supplemental Stipulation also contains a "Reservation of Rights" clause, under which both parties reserve all "rights, claims, defenses, and arguments with regard to the Federal Returns (or the tax return(s) which the FDIC-R asserts it could have filed)[.]"  FDIC-R Mot., Ex. I ¶ 6; *see also id.* ¶¶ 7-8.

On August 30, 2010, the FDIC-R filed a motion in the Bankruptcy Court to lift the automatic stay to permit the FDIC-R to file an alternative tax return on behalf of the Consolidated Tax Group, pursuant to I.R.C. § 6402(k) and Treas. Reg. § 301.6402-7 (the "Dash 7 Regulation").  FDIC-R's Mot., Ex. J.  The purpose of the alternative refund was to protect the FDIC-R's position that the Net Operating Loss theory is the only proper basis for a refund. FDIC-R Mot. at 19.

On September 13, 2010, the Bankruptcy Court granted the FDIC-R's August 30, 2010 Motion To Lift The Automatic Stay.  FDIC-R Mot., Ex. L.  On or before September 15, 2010, the FDIC-R filed an alternate Form 1120 for tax year 2008, as well as five Form 1120X Claims for Refund to carry back the refund to tax years 2003-2007.  FDIC-R Compl. ¶ 24; FDIC-R Mot., Ex. O.  In the September 15, 2010 alternate Form 1120, the FDIC-R claimed a

---

[5] DFC's amended claims for refunds are reflected in the following chart:

| Tax Year | Amount | Source |
|---|---|---|
| 2003 | $19,620,833 | Compl., Ex. C, 2003 Claim for Refund at 1, l.11 |
| 2004 | $31,619,070 | Compl., Ex. C, 2004 Claim for Refund at 1, l.11 |
| 2005 | $115,746,463 | Compl., Ex. C, 2005 Claim for Refund at 1, l.11 |
| 2006 | $107,454,982 | Compl., Ex. C, 2006 Claim for Refund at 1, l.11 |
| 2007 | $38,514,478 | Compl., Ex. C, 2007 Claim for Refund at 1, l.11 |
| **Total** | $312,955,826 | |

Compl. ¶¶ 34, 36, 38, 40, 42.

$1,855,123,698 loss, primarily attributable to DSL's net operating losses in 2008, resulting in a total requested refund of $373,791,733 after the loss was carried back for tax years 2003-2007.[6]

On September 10, 2010, the Trustee amended DFC's December 31, 2009 1120X Claims for Refund for tax years 2003-2007 to reflect the same refund amount as requested by the FDIC-R's alternate September 15, 2009 1120X filings. Compl. ¶¶ 44, 46, 48, 50, 52; *compare* Compl., Ex. D (Trustee's amended 1120X forms), *with* FDIC-R Compl., Ex. O (FDIC-R's 1120X forms). Thus, the total refund claimed by the Trustee for tax years 2003-2007 also was $373,791,733, plus statutory interest. Compl. ¶ 12.

On October 28, 2010, the Trustee initiated an adversary proceeding against the FDIC-R in Bankruptcy Court, seeking a declaration that any federal income tax refunds for the Consolidated Tax Group are the property of DFC's bankruptcy estate. *See Claybrook* v. *FDIC*, Adv. Proceeding No. 10-53731-CSS, Docket No. 1 (Bankr. D. Del. Oct. 28, 2010) (reproduced at FDIC-R Mot., Ex. P). On December 31, 2010, the FDIC-R filed an Amended Answer denying the allegations and asserting counterclaims seeking a declaration that any tax refunds are the property of the FDIC-R. *See Claybrook* v. *FDIC*, Adv. Proceeding No. 10-53731-CSS, Docket No. 15 (reproduced at FDIC-R Mot., Ex. R).

On November 24, 2010, the Trustee initiated a second adversary proceeding against the FDIC-R in the Bankruptcy Court, contesting all claims asserted in the FDIC-R's October 29, 2009 Proof of Claim and asserting counterclaims against FDIC-R for disallowance of FDIC-R's claim to any tax refund, and for alleged breaches of the Supplemental Stipulation and the Tax Sharing Agreement. *See Claybrook* v. *FDIC*, Adv. Proceeding No. 10-55567-CSS, Docket No. 1 ¶¶ 179-83, 225-41, 255-59 (reproduced at FDIC-R Mot., Ex. T). In so doing, the Trustee acknowledged that "[i]f the Trustee's . . . [Worthless Stock Loss theory] is approved [by the United States Court of Federal Claims or the IRS], . . . any net operating losses of Downey Savings are eliminated; the Federal Refunds are owned by DFC; and the Receiver has no claim whatsoever relating to taxes." *Id.* ¶ 181.

On May 6, 2011, the Trustee filed a Motion For Summary Judgment in the October 28, 2010 Adversary Proceeding in the Bankruptcy Court, seeking a declaration that the FDIC-R had

---

[6] The amount of FDIC-R's tax refund claims for tax years 2003-2007 are reflected in the following chart:

| Tax Year | Amount | Source |
|----------|--------|--------|
| 2003 | $20,012,896 | FDIC-R Mot., Ex. O, Docket No. 24-16 at 2. |
| 2004 | $83,041,887 | FDIC-R Mot., Ex. O, Docket No. 24-16 at 37. |
| 2005 | $116,730,700 | FDIC-R Mot., Ex. O, Docket No. 24-16 at 61. |
| 2006 | $113,667,572 | FDIC-R Mot., Ex. O, Docket No. 24-17 at 21. |
| 2007 | $40,338,678 | FDIC-R Mot., Ex. O, Docket No. 24-17 at 43. |
| **Total** | $373,791,733 | |

FDIC-R Compl. ¶ 27.

violated the automatic bankruptcy stay through its dealings with the IRS and that any tax refunds be declared property of the bankruptcy estate. *See Claybrook* v. *FDIC*, Adv. Proceeding No. 10-53731-CSS, Docket No. 82 (reproduced at FDIC-R Mot., Ex. S). On June 10, 2011, the FDIC-R filed a Response opposing the Trustee's Motion For Summary Judgment. *See Claybrook* v. *FDIC*, Adv. Proceeding No. 10-53731-CSS, Docket No. 92. On June 24, 2011, the Trustee filed a Reply. *See Claybrook* v. *FDIC*, Adv. Proceeding No. 10-53731-CSS, Docket No. 95. On January 18, 2012 and February 6, 2012, the Trustee filed Notices Of Supplemental Authority, to which the FDIC-R responded on January 23, 2012 and February 10, 2012. *See Claybrook* v. *FDIC*, Adv. Proceeding No. 10-53731-CSS, Docket Nos. 106-109.

## III.   PROCEDURAL HISTORY IN THE UNITED STATES COURT OF FEDERAL CLAIMS.

On October 29, 2010, the Trustee filed a Complaint, on behalf of DFC, in the United States Court of Federal Claims alleging that the United States (the "Government") owed DFC a federal tax refund for the tax years 2003-2007 in the amount of $373,791,733, plus statutory interest ("Compl.").

In a December 27, 2010 email, the IRS advised the FDIC-R that, as a result of the Trustee's having commenced this lawsuit, the IRS "suspended any further actions with respect to [audit years 2003–2008] for returns filed by the FDIC and by the Trustee, pending a ruling from the Court of Claims." FDIC-R Mot., Ex. X; FDIC-R Compl. ¶ 29.

On December 14, 2010, February 22, 2011, and March 31, 2011, the Government filed Motions For Enlargement Of Time To File An Answer. The court granted these motions on December 15, 2010, February 23, 2011, and April 1, 2011.

On April 1, 2011, the Government filed a Motion For Joinder Of FDIC-R, Pursuant To RCFC 19, Or In The Alternative, Dismissal Of The October 29, 2010 Complaint, Pursuant To RCFC 12(b)(7) ("Gov't Mot."). On April 14, 2011, the Trustee requested an 18-day enlargement of time to respond. The court granted the extension the next day. On May 18, 2011, the Trustee requested an additional extension that the court granted on May 20, 2011.

On June 17, 2011, the Trustee filed a Response to the Government's April 1, 2011 Motion for Joinder ("6/17/11 TR Resp."). On June 23, 2011, the Government filed a Motion For A 14-Day Extension To File A Reply. On June 27, 2011, the court granted this request.

On July 11, 2011, the Government filed a Reply to the Trustee's June 17, 2011 Response ("Gov't Reply").

On July 12, 2011, the FDIC-R filed a Motion To Intervene, Pursuant To RCFC 24 ("FDIC-R Mot.").[7] On July 22, 2011, the Trustee requested an extension to respond to FDIC-R's Motion to Intervene. The court granted this request on July 25, 2011.

---

[7] Before doing so, the FDIC-R requested and obtained permission from the Bankruptcy Court to intervene in this case. FDIC-R Mot., Exs. U, W.

On August 9, 2011, the Trustee filed a Response ("8/9/11 TR Resp.") in opposition to FDIC-R's July 12, 2011 Motion To Intervene.

On August 19, 2011, the FDIC-R filed a Reply ("FDIC-R Reply") in support of its July 12, 2011 Motion To Intervene.

On August 24, 2011, the Government filed a Motion For Leave To File A Brief In Response To The Trustee's August 9, 2011 Response. The court granted this motion on August 25, 2011 and the Government filed a Response the same day ("8/25/11 Gov't Resp.").

On September 9, 2011, the Trustee requested leave to file an Omnibus Sur-Reply In Opposition To The Government's Motion For Joinder And The FDIC-R's Motion To Intervene. FDIC-R objected. On September 12, 2011, the court accepted Trustee's Omnibus Sur-Reply ("TR Omn. Reply"), but also granted the FDIC-R and the Government leave to file further briefs by October 3, 2011. On October 3, 2011, the FDIC-R filed a Response to the Trustee's Omnibus Sur-Reply ("FDIC-R Omn. Resp.") and the Government also filed a Response ("Gov't Omn. Resp.").

On February 17, 2012, the court heard oral argument on the pending motions in New York City. On March 22, 2012, at the joint request of the Bankruptcy Court and the United States Court of Federal Claims, a conference was held at the United States Bankruptcy Court for the District of Delaware, in Wilmington, Delaware, with counsel for all parties, to discuss procedural matters of concern to both courts.

## IV.   DISCUSSION.

### A.   Jurisdiction.

#### 1.   The Relevant Statutes And Regulations.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States* v. *Testan*, 424 U.S. 392, 398 (1976) (citations omitted). Therefore, to pursue a claim under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker

Act . . . does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. In the parlance of Tucker Act cases, that source must be 'money-mandating.'" (citations omitted)).

The Tucker Act permits the United States Court of Federal Claims to adjudicate tax refund claims, but only if a taxpayer has met all the procedural requirements to seek a refund directly from the IRS. *See United States* v. *Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 11 (2008) ("Congress has . . . established a detailed refund scheme that subjects complaining taxpayers to various requirements before they can bring suit."). Specifically, before filing a tax refund suit in the United States Court of Federal Claims, a plaintiff must first comply with the jurisdictional procedures mandated by I.R.C. § 7422(a)[8] and I.R.C. § 6511(a)[9]. *See id.* at 4-5. This requires, at least, that the taxpayer have paid the full assessed federal tax liability and timely filed a refund claim with the IRS stating the grounds for the claim. *See id.*; 28 U.S.C. § 1491(a); I.R.C. §§ 6511(a), 7422(a). If the claim is denied by the IRS and the taxpayer timely files suit, or if six months have passed since the filing of the claim without resolution by the IRS, then the United States Court of Federal Claims has jurisdiction to adjudicate the tax refund claim. *See* I.R.C. § 6532(a) (2006).

---

[8] I.R.C. § 7422(a) provides:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

I.R.C. § 7422(a) (2006).

[9] I.R.C. § Section 6511(a) provides:

Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid. Claim for credit or refund of an overpayment of any tax imposed by this title which is required to be paid by means of a stamp shall be filed by the taxpayer within 3 years from the time the tax was paid.

I.R.C. § 6511(a) (2006).

The procedure for filing a lawsuit for a federal tax refund is set forth in I.R.C. §§ 6401-09.  The "[g]eneral rule" provides:

> In the case of any overpayment, the Secretary [of the Department of Treasury], within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax *on the part of the person who made the overpayment* and shall, subject to subsections (c), (d), (e), and (f), refund any balance to such person.

I.R.C. § 6402(a) (2006) (emphasis added).

In addition, I.R.C. § 6402(k) provides:

> Notwithstanding any other provision of law, in the case of an insolvent corporation which is a member of an affiliated group of corporations filing a consolidated return for any taxable year and which is subject to a statutory or court-appointed fiduciary, *the Secretary [of the Department of Treasury] may[,] by regulation[,] provide that any refund for such taxable year may be paid on behalf of such insolvent corporation to such fiduciary* to the extent that the Secretary determines that the refund is attributable to losses or credits of such insolvent corporation.

I.R.C. § 6402(k) (emphasis added).  As a result, the Internal Revenue Code provides that federal tax refunds may be paid to the "person who made the overpayment," but also authorizes the Secretary to promulgate regulations allowing a refund to be paid to the fiduciary of an insolvent corporation whose federal incomes taxes were paid via a consolidated return.  I.R.C. § 6402(a), (k).

In addition, it is relevant to this case that the Department of Treasury promulgated a regulation to implement I.R.C. § 1502,[10] authorizing "the common parent . . . for a consolidated return year [as] the *sole agent (agent for the group)* . . . to act in its own name with respect to all matters relating to the tax liability for that consolidated return year for [e]ach member in the group."  Treas. Reg. § 1.1502-77(a)(1)(i)(A) (2011) (emphasis added) (the "Dash 77 Regulation").  A claim for refund is required to be filed "in the name of the common parent and discharges any liability of the Government to any member with respect to such refund[.]"  Treas.

---

[10] I.R.C. § 1502 provides:

> [t]he Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted[.]

I.R.C. § 1502.

Reg. § 1.1502-77(a)(1)(v) (2011).  The Dash 77 Regulation also expressly provides that "[f]or further rules applicable to groups that include insolvent financial institutions, see § 301.6402-7 [*i.e.*, the Dash 7 Regulation] of this chapter."  Treas. Reg. § 1.1502-77(g) (2011).

In turn, the Dash 7 Regulation, promulgated pursuant to I.R.C.§ 6402(k), authorizes the FDIC to act as a "fiduciary" for the purpose of filing an alternate tax return for a consolidated tax group.  Treas. Reg. § 301.6402-7(b)(3)(i).  Specifically, the Dash 7 Regulation provides:

> (c) Deemed agency status of fiduciary (1) In general. *Notwithstanding the general treatment of a common parent as the agent of a group under §§ 1.1502–77 [i.e., the Dash 77 Regulation] and 1.1502–78 of this chapter, if the fiduciary satisfies the notice requirements of paragraph (d)(1) of this section, the fiduciary may also be deemed to be an agent* under §§ 1.1502–77 and 1.1502–78 of this chapter--
>
>> (i) Of the loss year group (if any) for purposes of filing a consolidated return for the loss year;
>>
>> (ii) Of the carryback year group for purposes of filing a claim for refund or an application for a tentative carryback adjustment for the consolidated carryback year under paragraph (e) of this section and receiving payments of any refund or tentative carryback adjustment under paragraph (g) of this section; and
>>
>> (iii) Of the carryback year group, the loss year group or any other group of which the institution is a member for any matter pertaining to the determination of the refund or tentative carryback adjustment, but only to the extent provided in paragraph (c)(2) of this section.
>
> (2) Limitation. The fiduciary may act as an agent for matters described in paragraph (c)(1)(iii) of this section only to the extent—
>
>> (i) Authorized by the district director, in his/her sole discretion, after receiving a written request from the fiduciary; or
>>
>> (ii) Requested by the Internal Revenue Service under paragraph (f)(3) of this section.

26 C.F.R. § 301.6042-7(c) (emphasis added).

The parties disagree as to whether the court has jurisdiction to adjudicate an alternate tax return filed by FDIC-R, and, therefore, whether FDIC-R is entitled to intervene as of right under this statutory and regulatory scheme.

2.      **Whether The Government Has Waived Sovereign Immunity For The Federal Deposit Insurance Corporation-Receiver To Seek An Adjudication Of A Federal Tax Refund Suit In The United States Court Of Federal Claims.**

a.      **The Trustee's Argument.**

The Trustee argues that I.R.C. § 6402(a) provides that only "the person who made the overpayment" is authorized by Congress to file a tax refund case in the United States Court of Federal Claims. 8/9/11 TR Resp. at 9-17; TR Omn. Reply at 5-14. The FDIC-R admits that DFC "made" the overpayments on behalf of the Consolidated Tax Group, so FDIC-R has effectively conceded that only DFC may sue for a federal tax refund in this court. 8/9/11 TR Resp. at 9 (citing FDIC-R Mot. at 5); TR Omn. Reply at 9. Therefore, the FDIC-R is not entitled to file a suit in the United States Court of Federal Claims for a federal tax refund, in its capacity as an "alternate agent" for the Consolidated Tax Group, pursuant to the Dash 7 Regulation, because the Consolidated Tax Group also did not "make" the overpayment. 8/9/11 TR Resp. at 16-17. In addition, the Consolidated Tax Group is not authorized to file a claim for a federal tax refund in this court because I.R.C. § 6402(a) requires that a refund claim can only be paid to a "person." *See* I.R.C. § 6402(a); *see also* I.R.C. § 7701(a)(1) (2006) (defining "person" as "includ[ing] an individual, a trust, estate, partnership, association, company or corporation"). A consolidated tax group, however, is a legal fiction, not a "person," as defined by the Internal Revenue Code.

The Trustee also rejects the FDIC-R's fallback position that I.R.C. § 6402(k), as implemented by the Dash 7 Regulation, waives sovereign immunity so as to allow the FDIC-R to file a claim for a federal tax refund on behalf of the Consolidated Tax Group in this court. 8/9/11 TR Resp. at 13. Specifically, I.R.C. § 6402(k) "vests the Secretary [of Treasury] with *discretion* to promulgate regulations relating to payment of a refund to the fiduciary . . . for the administrative convenience of the IRS." 8/9/11 TR Resp. at 13 (emphasis added). Therefore, in contrast with I.R.C. § 6402(a), Section 6402(k) is not an unequivocal expression of consent to be sued, because a money-mandating statute must exhibit a lack of discretionary authority in the agency charged with its implementation. 8/9/11 TR Resp. at 15 (citing *Shrader* v. *United States*, 38 Fed. Cl. 788, 797 (1997) ("[T]here is clear precedent which equates . . . a money mandating statute with a lack of discretionary authority in the agency charged with its implementation.")).

Furthermore, the Dash 7 Regulation also is discretionary, in that it states that the FDIC-R, as a "fiduciary" of an insolvent corporation "*may* also be deemed [by the IRS] to be an agent . . . [o]f the carryback year group for purposes of filing a claim for refund." 26 C.F.R. § 301.6402-7(c)(ii) (emphasis added). In addition, the Dash 7 regulation provides that "[*n*]*othing in this section obligates the Internal Revenue Service* to pay to the fiduciary all or any portion of a claim for refund or application for tentative carryback adjustment." Treas. Reg. § 301.6402-7(g) (2011) (emphasis added). Therefore, the Dash 7 Regulation does not obligate the IRS to pay a federal tax refund to a fiduciary and, since the regulation is not money-mandating, it cannot waive sovereign immunity. 8/9/11 TR Resp. at 14. The Dash 7 Regulation only provides a fiduciary with an avenue for initiating administrative proceedings, not a tax refund case in federal court. TR Omn. Reply at 5 n.4.

Finally, the Trustee posits that, if both the Trustee and the FDIC-R are entitled to seek recovery of the same tax refund, the court is being asked to determine which entity is entitled to receive the refund, requiring an adjudication of the rights of private parties. TR Omn. Reply at 13-14. This problem is avoided only if one party, *i.e.*, "the person who made the overpayment" is permitted to pursue relief in this court. TR Omn. Reply at 14.

### b.      The Government's Response.

The Government responds that the United States has only waived sovereign immunity as to allow the *Consolidated Tax Group* to sue for a refund, but not as to the Trustee, as representative of the Consolidated Tax Group's parent, or the FDIC-R itself in its own corporate capacity. 8/25/11 Gov't Resp. at 7-8. It is "indisputable" that the Consolidated Tax Group is the taxpayer, as that is the name on every return. 8/25/11 Gov't Resp. at 8. DFC did *not* "ma[k]e an overpayment," as that term is used in Section 6402(a), in its own corporate capacity. 8/25/11 Gov't Resp. at 8-9. If it had done so, it would have made a voluntary tax payment on DSL's behalf and would not be entitled to a refund, because it is "'well established that in order to maintain an action for the refund of federal taxes under the Internal Revenue Code, the plaintiff must be a taxpayer who has overpaid its own taxes.'" 8/25/11 Gov't Resp. at 8 (quoting *Ammex, Inc.* v. *United States*, 52 Fed. Cl. 303, 309 (2002)).

The Government also insists that the United States Supreme Court's decision in *United States* v. *Williams*, 514 U.S. 527 (1995), permitting an ex-wife of a taxpayer to seek a refund of federal taxes that she paid on her ex-husband's behalf, is not to the contrary. Gov't Omn. Resp. at 4-6. In *Williams*, the wife paid the federal tax due because the IRS attached a lien on a house that she owned as a result of the division of the couple's marital property upon divorce. *Williams*, 514 U.S. at 540. Therefore, she was still "'*subject to*' the tax in a meaningful and immediate way." *Id.* (emphasis added) ("Williams paid under protest, solely to gain release of the Government's lien on her property — a lien she attacked as erroneously maintained."). The Court, in *Williams*, however, did not disturb the general rule that a "volunteer" taxpayer has no standing to pursue a federal tax refund. *See id.* ("We do not decide the circumstances, *if any*, under which a party who volunteers to pay a tax assessed against someone else may seek a refund[.]" (emphasis added)).

Therefore, since the FDIC-R and DFC are each permitted to file tax returns on behalf of the Consolidated Tax Group, they are on equal jurisdictional footing to seek a federal tax refund in this court. 8/25/11 Gov't Resp. at 10-13. The Dash 77 Regulation authorizes DFC to act as an agent for the Consolidated Tax Group. 8/25/11 Gov't Resp. at 11. But I.R.C. § 1502 does not waive sovereign immunity with respect to the parent corporation in its own capacity. Likewise, the Dash 7 Regulation authorizes the FDIC-R only to act as an *agent* for the Consolidated Tax Group, but does not waive the United States' sovereign immunity with respect to the FDIC-R acting in a corporate capacity. 8/25/11 Gov't Resp. at 11-12. Thus, neither the Trustee nor FDIC-R is authorized to file a federal tax refund in its own capacity, but *either or both* may do so in its equal capacity as a competing agent for the Consolidated Tax Group. 8/25/11 Gov't Resp. at 12-13.

c.      **The Federal Deposit Insurance Corporation-Receiver's Response.**

The FDIC-R responds that Congress waived the sovereign immunity of the United States in tax refund cases by the Tucker Act, 28 U.S.C. § 1491, in combination with I.R.C. § 7422, not by operation of I.R.C. § 6402(a).  I.R.C. § 7422(a) is the substantive, money-mandating statute. FDIC-R Reply at 8-9.   Accordingly, no further waiver of sovereign immunity is required, because the Dash 7 Regulation authorizes the FDIC-R to act as alternate agent of the Consolidated Tax Group and sovereign immunity is waived for any entity authorized to file a federal tax return by the Internal Revenue Code.  FDIC-R Reply at 9-10.

Even if the court were to conclude that the relevant waiver of sovereign immunity is I.R.C. § 6402, the FDIC-R maintains this statute also authorizes FDIC-R to file a tax return claim in the United States Court of Federal Claims.  First, contrary to the Trustee's position, DFC (the parent corporation) is not the entity that "made the overpayment" under I.R.C. § 6402(a).  The Consolidated Tax Group "made" the overpayments, because the tax liability was paid by DFC as an agent for the consolidated tax group, not by DFC in its own corporate capacity.  *See* 26 C.F.R. § 1.1502-77(a)(1)(i)(A) (2011) ("[T]he common parent . . . for a consolidated return year is the sole *agent* (*agent for the group*)[.]" (emphasis added)); *see also* TR Omn. Sur-Reply at 7 n.6 (conceding that DFC filed tax refunds "on behalf of the Consolidated Tax Group").  Therefore, the fact that DFC *issued* a payment to the IRS does not mean that it "made" the payment.  FDIC-R Reply at 11-12; FDIC-R Omn. Resp. at 3-5.

Second, a consolidated tax group is defined by Treasury regulation as a "person" that can "ma[k]e an overpayment."  FDIC-R Omn. Resp. at 11-14 (citing Treas. Reg. § 301.7701-6(a) (2011)).  Although the statutory definition of "person" in I.R.C. § 7701(a)(1) does not mention tax groups, it does provide that the term person "shall be construed to . . . *include*" several types of enumerated entities.  I.R.C. § 7701(a) (emphasis added).  In turn, I.R.C. § 7701(c) clarifies that "[t]he term[] 'includes' . . . when used in a definition contained in this title *shall not be deemed to exclude other things otherwise within the meaning of the term defined*."  I.R.C. § 7701(c) (2006) (emphasis added).  A Treasury regulation also clarifies that "groups" are persons for purposes of the Tax Code.  *See* Treas. Reg. § 301.7701-6(a).  Accordingly, a consolidated tax group is a "person" that can "ma[k]e" an overpayment under I.R.C. § 6402(a).  FDIC-R Omn. Resp. at 11-14.  Therefore, as alternate agent for the Consolidated Tax Group, the FDIC-R is authorized to seek an adjudication of a tax refund claim in this court.

The FDIC-R adds that, if the Trustee's position is correct, the FDIC-R would be entitled to file an administrative claim for a tax refund under the Dash 7 Regulation, but if that claim were denied, the FDIC-R would have no right to a judicial determination, unless the parent company filed a tax refund claim.  The United States Supreme Court, however, has cautioned that interpretations of I.R.C. § 6402(a) should favor "commonsense inquiries over formalism," since Congress did not "intend[] to leave parties . . . without a remedy."  *Williams*, 514 U.S. at 536.

Finally, the FDIC-R rejects the Trustee's contention that I.R.C. § 6402(a) waives sovereignty for DFC because of the word "shall," but I.R.C. § 6402(k) and the Dash 7

Regulation do not waive sovereignty for the FDIC-R because of the permissive language contained therein.  FDIC-R Reply at 10-11 n.13  In fact, IRS regulations authorize the agency to deal with *either* the parent of a consolidated tax group *or* with a fiduciary.  *See* Treas. Reg. § 301.6402-7(a)(2)(ii) & (k) ("The [IRS] *may* deal directly with the common parent *or* the fiduciary (*or* both) as agent for the group[.]" "Any refund or tentative carryback adjustment paid to the fiduciary discharges any liability of the Government to the same extent as payment to the common parent[.]" (emphasis added)).  Therefore, although the IRS has discretion to pay any tax refund due either to DFC or the FDIC-R, that agency discretion is not relevant to the issue of sovereign immunity.

### d.      The Court's Resolution.

The court has determined that the waiver of sovereign immunity is found in I.R.C. § 7422, not 28 U.S.C. § 1346(a)[11] or I.R.C. § 6402.  *See Chicago Milwaukee Corp.* v. *United States*, 40 F.3d 373, 374 (Fed. Cir. 1994) ("Section 7422(a) waives the United States' sovereign immunity from [federal tax] refund suits, provided the taxpayer has previously filed a qualifying administrative refund claim.") (internal citations omitted)); *see also Hinck* v. *United States*, 64 Fed. Cl. 71, 76 & n.7 (2005), *aff'd* 446 F.3d 1307 (2006), 550 U.S. 501(2007) (explaining why I.R.C. § 7422(a) taken together with the Tucker Act, not 28 U.S.C. § 1346(a), provides the general sovereign immunity waiver for the United States Court of Federal Claims to adjudicate tax refund suits).  Therefore, the relevant jurisdictional issue is whether the FDIC-R has "compl[ied] with the tax refund scheme established in the [Internal Revenue] Code" by filing a tax refund on behalf of the Consolidated Tax Group.  *See United States* v. *Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4, 12 (2008).  Several jurisdictional prerequisites must be established, before a taxpayer has standing.  *Id.* at 11 ("Congress has . . . established a detailed refund scheme that subjects complaining taxpayers to various requirements before they can bring suit.").

The Secretary of the Treasury "may by regulation provide that any refund . . . may be paid on behalf of [an] insolvent corporation to [a] fiduciary to the extent that the Secretary determines that the refund is attributable to losses or credits of such insolvent corporation." I.R.C. § 6402(k).  Pursuant to that authority, the Secretary promulgated the Dash 7 Regulation. *See* Treas. Reg. § 301.6402-7(c) ("*Notwithstanding the general treatment of a common parent as the agent of a group under [the Dash 77 Regulation] and [§] 1.502-78 of this chapter . . .* the fiduciary may also be deemed to be an agent under [the Dash 77 Regulation] and [§] 1.502-78 of this chapter[.]" (emphasis added)).  As such, the Dash 7 Regulation authorizes the FDIC-R to file

---

[11] Section 1346(a)(1) provides:

The *district courts* shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of: (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws[.]

28 U.S.C. § 1346(a)(1) (2006) (emphasis added).

an alternative federal tax return and a refund claim seeking an adjudication of that claim as the agent for the Consolidated Tax Group.

Having filed a request for a tax refund, the FDIC-R is then entitled to file a claim for any refund due in the United States Court of Federal Claims, so long as the IRS denies the refund or fails to act upon the refund claim within six months. *See* I.R.C. § 6532(a)(1) ("No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax . . . shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time[.]"). In this case, the FDIC-R filed an alternate tax return for a refund on September 15, 2010. *See* FDIC-R Mot., Ex. O. The IRS did not act upon FDIC-R's alternate tax return within six months and has indicated that it does not intend to do so until the court adjudicates the Trustee's tax refund claims at issue in this action. FDIC-R Mot., Ex. X. On July 12, 2011, the FDIC-R filed the Motion To Intervene in this case. As such, the FDIC-R has complied with the jurisdictional prerequisites.

The Trustee, however, insists that money-mandating provisions may not be discretionary, and that the discretionary Dash 7 Regulation is therefore an invalid waiver of sovereign immunity. 8/9/11 TR Resp. at 15-16. True, but irrelevant. The money-mandating provision here is I.R.C. § 7422, not the Dash 7 Regulation. Once Congress waives sovereign immunity, the Secretary of the Treasury may promulgate any reasonable implementing regulations to implement I.R.C. §§ 6401-09, which govern the *procedure* for filing tax refund claims. The Trustee's suggestion that Congress abrogated I.R.C. § 7422's waiver of sovereign immunity by allowing the IRS discretion to choose to pay a refund to either of several tax agents is contrary to the United States Supreme Court's admonition that the United States subjects itself to suit in whatever manner "it consents to be sued." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980); *see also Williams*, 514 U.S. at 541 (Scalia, J. concurring) ("'The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced.'" (quoting *United States* v. *Aetna Casualty & Surety Co.*, 338 U.S. 366, 383 (1949))).[12]

Even assuming, *arguendo*, that the Trustee is correct that I.R.C. § 6402(a) is the relevant money-mandating statute, and that it only waives sovereign immunity for the "person who made the overpayment" to seek a refund,[13] the court has determined that the Consolidated Tax Group,

---

[12] According to the Trustee's logic, the following hypothetical statute would be a valid waiver of sovereign immunity: "The United States waives its immunity to all lawsuits seeking a tax refund." However, a second hypothetical statute, granting discretion to an agency, would not waive sovereign immunity: "The United States waives its immunity to all lawsuits seeking a tax refund but the Secretary may choose which entity affected by the original tax payment may receive the refund." Such a waiver of sovereign immunity certainly involves agency discretion in implementing the waiver, but how the statute is implemented does not contravene Congress' unambiguous intent to waive sovereign immunity in the first place.

[13] The Trustee's argument relies upon *Amigo Enterprises, Inc.* v. *United States*, 41 Fed. Cl. 462, 467 (1998) ("Because [the taxpayer] did not pay taxes directly to the IRS, it lacks standing to sue for a refund."); *Scanlon* v. *United States*, 330 F. Sup. 269, 270-71 (E.D. Mich.

not DFC, is the "person who made the overpayment." *See* Treas. Reg. § 301.7701-6(a) ("The term person includes . . . a syndicate, group, pool, joint venture, or other unincorporated organization or group."). The Dash 77 Regulation permits a parent to remit tax payments for a consolidated tax group, but provides that the parent does so as the "agent *for the group*." Treas. Reg. § 1.1502-77 (emphasis added). Thus, the Consolidated Tax Group, not the parent DFC, "made" the overpayments under basic principles of agency. *See, e.g.*, RESTATEMENT (THIRD) OF AGENCY § 8.05, Rep. Note 6 (2006) (stating that, when acting for a principal, an agent does "not use property of the principal *for the agent's own purposes* or those of a third party" (emphasis added)). Accordingly, the FDIC-R is equally entitled to file a tax refund suit on behalf of the Consolidated Tax Group, because, like DFC, the FDIC-R is authorized by Treasury regulation to act as the group's agent. *See* Treas. Reg. § 1.1502-77(g) ("For further rules applicable to groups that include insolvent financial institutions, see [the Dash 7 Regulation]."); *see also* Treas. Reg. § 301.6402-7(b)(3)(i), (c)(1) (listing the FDIC as a "fiduciary" of insolvent financial institutions and providing that a "fiduciary" "may also be deemed to be an agent under [the Dash 77 Regulation]").

Finally, if the Trustee were correct, it would mean that Congress created a means for the FDIC-R to file a tax return with the IRS via I.R.C. § 6402(k) to protect the assets of bankrupt financial institutions in receivership, but intended to deny the FDIC-R the ability to enforce this right in federal court. Such a result would undermine the coherence of the Internal Revenue Code. *See* 6 FED. REG. 67487, 67488 (Dec. 31, 1991) (stating the Dash 7 regulation was promulgated "to effectuate the purposes of [I.R.C. § 6402(k)], that refunds with respect to losses and credits of an insolvent financial institution be paid to a fiduciary for the institution"); *see also* 57 FED. REG. 53032, 53033 (Nov. 6 1992) (explaining that the Dash 7 Regulation allows fiduciaries to file for a refund, even though a parent of a consolidated tax group has done so,

---

1971) (holding that an employee could not file a refund for tax payments that were "made by" his employer); and *Majestic Communications Grp.* v. *United States*, No. 3:09-CV-695, 2011 WL 2491372 at *2 (S.D. Miss. June 22, 2011) (Slip. Op.) ("[A] party who is not 'the person who made the overpayment' is not permitted to receive the overpayment refund and therefore lacks standing to pursue the refund in court."). All of these cases, however, rely upon I.R.C. § 6402(a), and hold that a person who owes a tax that has been paid by another is not entitled to file a tax refund, because that person did not "make the overpayment." None of these cases involved a situation where the party filing the tax refund is authorized to do so by a separate provision of the Internal Revenue Code, as is the case here with FDIC-R and I.R.C. § 6402(k). The Trustee also misreads *Williams* in assuming that "standing under Section 6402(a) is determined, not by who is the 'taxpayer,' but rather by who 'made the overpayment.'" TR Omn. Sur-reply at 9 (citing *Williams*, 514 U.S. at 532-33). Again, in *Williams* an ex-wife who "made an overpayment" by paying a tax that has been assessed against her ex-husband was not barred from seeking a refund in light of the plain language of Section 6402(a). *See Williams*, 514 U.S. at 534 ("To read the term 'taxpayer' [in I.R.C. § 6511(a)] as implicitly limiting administrative relief to the party assessed is inconsistent with other provisions of the refund scheme, which expressly contemplate refunds to parties other than the one assessed."). Therefore, *Williams*, stands for the mirror-image proposition that one who "makes an overpayment" may, under certain circumstances, be entitled to seek the refund, even though he or she is not the "taxpayer." *See id. Williams* did not hold that *only* the person who "makes" the payment may seek a refund.

since otherwise "the procedures could result in lengthy delays in the refund process and the fiduciary would have no relief if the common parent fails to make any filings").

For these reasons, the court has determined that I.R.C. § 7422 waives sovereign immunity and the FDIC-R has satisfied the jurisdictional requirements to seek an adjudication of a federal tax refund claim in the United States Court of Federal Claims, advanced under a different combination of legal theories than Trustee.

### 3.   Whether The Federal Deposit Insurance Corporation-Receiver Is Estopped From Pursuing This Federal Tax Refund Case.

#### a.   The Trustee's Argument.

Next, the Trustee contends that FDIC-R is "estopped from participating in this action," pursuant to the February 29, 2000 Tax Sharing Agreement and the March 17, 2010 Supplemental Stipulation in the Bankruptcy Court.  6/17/11 TR Resp. at 17-18.

First, the Tax Sharing Agreement provides that DFC "shall have the right, in its sole discretion: . . . (iii) to file, prosecute, compromise or settle any claim for refund[.]"  FDIC-R Mot., Ex. C (Tax Sharing Agreement, ¶ 2.4(a)).  Therein, DSL assigned any right it had to file its own tax refund claims to DFC.  6/17/11 TR Resp. at 17.  The FDIC-R could have disaffirmed or repudiated the Tax Sharing Agreement under 12 U.S.C. § 1821(e)(1),[14] but elected not to do so. 6/17/11 TR Resp. at 17.

Second, the parties entered a March 17, 2010 Supplemental Stipulation in the Bankruptcy Court that bars the FDIC-R from pursing a tax refund case in this court.  6/17/11 TR Resp. at 18. The Supplemental Stipulation, provides:

> the Trustee may deliver a copy of this Supplemental Stipulation to the IRS to advise the IRS that this Supplemental Stipulation, as so approved by the [Bankruptcy] Court, constitutes the consent of the FDIC-R to the processing of [the Trustee's tax returns] and to the payment of [any tax refunds owed by the

---

[14] 12 U.S.C. § 1821(e)(1) provides:

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
   (A) to which such institution is a party;
   (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
   (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

12 U.S.C. § 1821(e)(1) (2006).

IRS] to the Trustee, both in accordance with the terms of this Supplemental Stipulation.

FDIC-R Mot., Ex. I ¶ 5 (March 17, 2010 Supplemental Stipulation).

### b.    The Government's Response.

The Government counters that the Bankruptcy Court rejected the Trustee's argument that the Tax Sharing Agreement or the March 17, 2010 Stipulation estops the FDIC-R's participation in this lawsuit.  Gov't Reply at 11-15.  On September 9, 2010, the Trustee made the same arguments opposing the FDIC-R's August 30, 2010 request for relief from the automatic stay, to file an alternate tax return.  Gov't Reply at 11-12 (citing Gov't Mot., Ex. 31 (Trustee's September 9, 2010 brief in Bankruptcy Court)).  On January 6, 2011, the Bankruptcy Court rejected these arguments and issued an order relieving the FDIC-R from the automatic stay to allow it to file an alternative federal tax return on behalf of the Consolidated Tax Group and seek leave to intervene in this lawsuit.  Gov't Reply at 12.  Therefore, the Trustee is precluded from relitigating that issue before this court.  *See United Techs. Corp* v. *Chromalloy Gas Turbine Corp.*, 189 F.3d 1338, 1343 (Fed. Cir. 1999).  Moreover, the Tax Sharing Agreement cannot override the Dash 7 Regulation that provides specific authorization for the FDIC-R to file tax returns as an alternate agent for the Consolidated Tax Group.  Gov't Reply at 13-14.

Likewise, the March 17, 2010 Supplemental Stipulation does not divest FDIC-R of the ability to seek an adjudication of its federal tax claim in the United States Court of Federal Claims.  Instead it clarifies that FDIC-R has *not* abandoned any right to file an alternate tax return.  Gov't Reply at 14 (citing FDIC-R Mot., Ex. I ¶ 6).  Finally, the Anti-Assignment Act, 31 U.S.C. § 3727 (2006), prohibits the assignment of any claims against the United States, so FDIC-R is prohibited from conveying its right to seek a tax refund from the IRS to the Trustee.  Gov't Reply at 14-15.

### c.    The Federal Deposit Insurance Corporation-Receiver's Response.

The FDIC-R responds that neither the February 29, 2000 Tax Sharing Agreement nor the March 17, 2010 Supplemental Stipulation waived its right to file and pursue a federal tax refund on behalf of the Consolidated Tax Group in the United States Court of Federal Claims.  *See* FDIC-R Reply at 15 (citing 12 U.S.C. § 1821(c)(2)(B) (2006)).  The FDIC-R filed tax returns pursuant to its statutory authority as an alternate agent for the Consolidated Tax Group, not on behalf of DSL.  *See* I.R.C. § 6402(k); *see also* 26 C.F.R. § 301.6402-7.  As such, the FDIC-R does not need to disaffirm the February 29, 2000 Tax Sharing Agreement to seek an adjudication of its claim.  FDIC-R Reply at 15.

Likewise, the March 17, 2010 Supplemental Stipulation does not preclude the FDIC-R's exercising of its rights, since it consented only to the IRS's processing of the Trustee's tax returns; it did not abandon the FDIC-R's statutory right to act as alternative agent for the Consolidated Tax Group.  FDIC-R Reply at 15.

### d.    The Court's Resolution.

The court has determined that the February 29, 2000 Tax Sharing Agreement does not affect the FDIC-R's right to seek a tax refund. As a matter of law, the FDIC-R is entitled to file a tax return as alternate agent on behalf of the Consolidated Tax Group, pursuant to the Dash 7 Regulation. *See* Treas. Reg. § 301.6402-7. This statutory right cannot be abrogated by any prior agreement signed by the members of the Consolidated Tax Group. Nor is this right in any way diminished by the March 17, 2010 Supplemental Stipulation. That Stipulation expressly *preserves* the rights of both parties to pursue their respective federal tax refund claims "in an orderly manner without prejudice to either Party's position[.]" FDIC-R Mot., Ex. I at 4; *see also id.* ¶¶ 6-8.

### B.    Standing.

The parties also disagree as to whether the FDIC-R must have independent Article III standing to pursue a tax refund suit in the United States Court of Federal Claims and whether FDIC-R's federal tax refund claims constitute a "case or controversy" or a purely intragovernmental disagreement between the IRS and FDIC as to ownership of any refund.

### 1.    Whether This Dispute Presents A Case Or Controversy.

### a.    The Trustee's Argument.

The Trustee argues that the FDIC-R lacks standing, because there is no justiciable "case or controversy" between the FDIC-R and Treasury. 6/17/11 TR Resp. at 14-17; 8/9/11 TR Resp. at 17; TR Omn. Sur-Reply at 14-19. The gravamen of this argument is that the FDIC-C-administered DIF has incurred a potential loss of $1.4 billion as a result of the loss-sharing agreement between the FDIC and U.S. Bank (DSL's purchaser). 6/17/11 TR Resp. at 16-17 (citing Gov't Mot. at 5).[15] Therefore, the FDIC-R has an obligation to repay FDIC-C's priority claim for $1.4 billion before making other uses of any potential refund. In this federal tax refund case, however, the FDIC-R is seeking only $373,791,722, plus statutory interest. Therefore, the Trustee reasons that, "[e]ven if the FDIC were to . . . w[i]n a judgment for the entire amount it was seeking . . . none of the money paid by the government in satisfaction of such a judgment would leave the government." *Landmark Land Co.* v. *FDIC*, 256 F.3d 1365, 1380 (Fed. Cir. 2001); *see also Anderson* v. *United States*, 344 F.3d 1343, 1350 (Fed. Cir. 2003) ("[F]or the FDIC to have standing, the total amount of the FDIC's claims must exceed the amount the failing thrift, for which the FDIC stands as receiver, owes the United States." (citing *Admiral Fin. Corp.* v. *United States*, 329 F.3d 1372, 1382 (Fed. Cir. 2003))).

The Trustee acknowledges that in *Landmark*, *Anderson*, and *Admiral* the FDIC-R was required to pay any recovered funds into the FSLIC Resolution Fund, a Treasury-funded

---

[15] The Trustee's description of the facts, however, is slightly inaccurate. Contrary to the Trustee's characterization, the Government only appears to have stated that it *anticipates* that FDIC-C will have a $1.4 billion priority claim. *See* Gov't Omn. Rep. at 7 n.4 (making this point).

account.  Here, the FDIC-R would pay any federal tax refund to the privately funded DIF.  TR Omn. Sur-Reply at 17.  The Trustee, however, asserts the difference is immaterial, because the issue is whether recovery by the FDIC-R would exceed the total amount that it owes to another component of the Government.  TR Omn. Sur-Reply at 17-19; *see also Anderson*, 344 F.3d at 1350 ("'[T]he critical question is whether claims being asserted by the FDIC . . . [are] less than the government's priority claim arising from advances made to satisfy deposit liabilities of the failed thrift.'" (quoting *Admiral*, 329 F.3d at 1372)).  Moreover, in *Slattery* v. *United States*, 635 F.3d 1298 (Fed. Cir. 2011) (*en banc*), the United States Court of Appeals for the Federal Circuit held that the FDIC is a federal agency that can be sued under the Tucker Act, establishing that FDIC is a government agency for purposes of standing.  *Id.* at 1321.  Therefore, any recovery in this lawsuit by FDIC-R would run afoul of *Landmark*, *Admiral*, and *Anderson*, because any money recovered would simply move from one governmental pocket (the IRS) into another (the FDIC-C administered DIF).  TR Omn. Sur-Reply at 18-19.

**b.    The Government's Response.**

During briefing on the Government's April 1, 2011 Motion For Joinder, the Government argued that a "case or controversy" existed between the FDIC-R and the IRS, so long as the Bankruptcy Court had not yet adjudicated the ownership of any tax refund.  Gov't J. Reply at 7-11.  In the Government's October 3, 2011 Response, however, it now appears to adopt the FDIC-R's standing argument.  Gov't Omn. Resp. at 7-10.

**c.    The Federal Deposit Insurance Corporation-Receiver's Response.**

The FDIC-R responds that *Landmark* and its progeny are not relevant because the DIF, unlike the FSLIC Resolution Fund, is funded by private financial institutions, not federal funds. FDIC-R Mot. at 16-19; FDIC-R Reply at 14-15; FDIC Omn. Resp. at 15-18.  In *Landmark*, any damages that the FDIC recovered would have been paid from the FSLIC Resolution Fund, the same entity to which the FDIC-R was obligated.  *See Landmark*, 256 F.3d at 1381 ("[T]he FDIC [wa]s obligated to completely satisfy the claim of the [G]overnment, specifically that of the FSLIC Resolution Fund ("FRF"), against [the failed thrift] before distributing any proceeds to [the thrift's] other creditors.").  As such, "any damages recovered in [*Landmark*] by the FDIC, as receiver, 'would be paid *out of the FRF, and then distributed by the FDIC right back into the FRF*[.]'"  FDIC-R Mot. at 18 (quoting *Landmark*, 256 F.3d at 1381) (emphasis added).

"The critical distinction between this case and *Landmark* and other *Winstar*-related cases is that here any monies eventually received by the FDIC-C on account of its claim in the receivership would be paid into the privately funded [DIF], not a Treasury-funded fund."  FDIC-R Omn. Resp. at 16; *see Coast-to-Coast Fin. Corp.* v. *United States*, 52 Fed. Cl. 352, 364 (2002) (holding that the FDIC-R could intervene to recover funds that would be paid into the FDIC-C administered, but privately funded, Savings Association Insurance Fund, a predecessor fund to the DIF)).

The FDIC-R also rejects the Trustee's reliance on *Slattery*, because the issue in that case was whether the court had jurisdiction under the Tucker Act to adjudicate cases *brought against* FDIC, when it was acting in its *regulatory* capacity.  *See Slattery*, 635 F.3d at 1300-01.

### d.      The Court's Resolution.

In *Landmark*, a *Winstar* case, a failed thrift owed a $1.5 billion priority claim to the Federal Savings and Loan Insurance Corporation ("FSLIC") Resolution Fund.  *See Landmark*, 256 F.3d at 1381.  The FDIC-R moved to intervene in that case to assert claims against the United States in the amount of $674.2 million for breach of contract vis-à-vis the failed thrift, to which the FDIC-R was the successor-in-interest.  *Id.*  As successor to the failed thrift, the FDIC-R was obligated first to satisfy the FSLIC Resolution Fund.  *Id.*  This meant that, "[e]ven if the FDIC were to . . . w[i]n a judgment for the entire amount it was seeking . . . none of the money paid by the government in satisfaction of such a judgment would leave the government," and, "[i]t [was] undisputed that no private creditors could benefit even if the FDIC were to fully recover[.]"  *Id.* at 1380, 1381.  Under those facts, the United States Court of Appeals for the Federal Circuit held that "the FDIC has not established that its claims satisfy the justiciability requirements of Article III, § 2, because it has not shown that it and the government are adverse as to these claims."  *Id.* at 1381-82; *see also Anderson*, 344 F.3d at 1350 ("[F]or the FDIC to have standing, the total amount of the FDIC's claims must exceed the amount the failing thrift, for which the FDIC stands as receiver, owes the United States." (citing *Admiral*, 329 F.3d at 1382)).

In *Coast-to-Coast*, 52 Fed. Cl. 352, the United States Court of Federal Claims distinguished *Landmark* and determined that it had jurisdiction to adjudicate a suit by the FDIC-R in its capacity as receiver for an insolvent thrift, where any recovered funds would be paid into the privately funded Savings Association Insurance Fund ("SAIF"), a predecessor fund to the DIF.[16]  *Id.* at 364.  Critically, in *Coast-to-Coast*, as in this case, the "FDIC appear[ed] only as Receiver of [the insolvent institution] . . . not as Manager of [the FSLIC Resolution Fund]" and FDIC-R's "rights to recover and its obligation to pay any recovery [we]re not merged."  *Id.* at 364-65.

The DIF, like the SAIF, is a fundamentally different entity than the FSLIC Resolution fund at issue in *Landmark* and its progeny.  The DIF is not Treasury funded, but, rather, is funded entirely by "amounts assessed against insured depository institutions."[17]  *See* 12 U.S.C. §

---

[16]  In 2006, Congress merged the Bank Insurance Fund and SAIF into the newly established DIF.  *See* Federal Deposit Insurance Reform Act of 2005, Pub. L. No. 109-171, Title II, Subtitle B § 2102(a)(1) (2006) ("The Bank Insurance Fund and the Savings Association Insurance Fund shall be merged into the Deposit Insurance Fund.").

[17]  Dicta in *Slattery*, 635 F.3d 1298, might suggest that DIF is Treasury *backed*, but nothing in *Slattery* suggests DIF is Treasury *funded*.  *See Slattery*, 635 F.3d at 1318 ("Congressional pronouncements stress the full faith and credit of the United States in connection with the FDIC.").  The quotation in *Slattery* was made in the context of holding that the FDIC could be held liable under the Tucker Act for breach of contract.  *Id.* at 1300-01.  The fact that the full faith and credit of the United States supports any contract entered into by the

1821(a)(4)(D); *see also* 12 U.S.C. § 1815(d)(1) (providing that the FDIC may charge insured institutions any fee "which the Corporation may by regulation prescribe, after giving due consideration to the need to establish and maintain the reserve ratio of the [DIF]").

By contrast, in the *Landmark* line of cases, the FDIC was not an adverse party to the Department of Treasury, because the FDIC-R was asserting a claim that would have been paid out of the Treasury-funded FSLIC Resolution Fund and FDIC-R would have been obligated to pay any recovery back into the same fund. *See Landmark*, 256 F.3d at 1381 ("[E]ven if the FDIC were to fully recover, all proceeds from the judgment would be paid out of the [FSLIC Resolution Fund], and then distributed by the FDIC *right back into the* [*FSLIC Resolution Fund*]." (emphasis added)). Consequently, "FDIC's claim [could not] *affect* any party other than the [G]overnment." *Id.* (emphasis added). The United States Court of Appeals for the Federal Circuit observed, however, that the situation could be different, if recovery by FDIC-R would "either prevent third-party creditors from recovering on claims against the [FSLIC Resolution Fund], or increase the total amount of the [G]overnment's liability." *Id.* This issue was not presented in *Landmark*, because "Treasury is responsible for funding the [FSLIC Resolution Fund]." *Id.*

Here, private parties could be affected by the court's determination. DIF-insured institutions make payments into the DIF based, in part, on the reserves retained by DIF. *See* 12 U.S.C. § 1815(d)(1). Therefore, if DFC's Worthless Stock Loss theory prevailed, premiums for insured institutions would increase if the FDIC-R did not recoup funds to pay into the DIF as a result.

For these reasons, the court has determined FDIC-R has independent standing to pursue a tax refund suit against the IRS, since any federal tax refund would be paid into the privately funded DIF. Therefore, a "case" or "controversy" exists here between the IRS and the FDIC-R

---

FDIC, however, does not mean that the DIF is statutorily backed by the full faith and credit of the United States. *See* Federal Deposit Insurance Reform Conforming Amendments Act of 2005, Pub. L. No. 109-173 § 8(a)(11)(C), 119 Stat. 3601 (2006) (deleting 12 U.S.C. § 1821(a)(6)(D), which had provided that "the Secretary of the Treasury shall pay to the Savings Association Insurance Fund such amounts as may be needed to pay losses incurred by the Fund in fiscal years 1994 through 1998"). In 1989, the Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73 § 219-2, 103 Stat. 183 (1989), in which Congress pledged the nation's full faith and credit "to the payment of any *obligation issued* after August 9, 1989, by the Corporation, with respect to both principal and interest," but only if those obligations state the amount of principal and the term to maturity of the obligation. 12 U.S.C. § 1825(d) (emphasis added). This language suggests that FIRREA only pledged the United States' full faith and credit to FDIC's *borrowing*, not to its statutory obligation to make payments of uncertain amounts to insured institutions in the event of default. Moreover, in another subsection of the same statute, the term "obligation" is defined, at least for purposes of that subsection, as "any guarantee issued by the Corporation, *other than deposit guarantees*[.]" 12 U.S.C. 1825(c)(6)(A)(i) (emphasis added). Thus, it is unclear whether the DIF is Treasury *backed*, but it is clear that it is not Treasury *funded*.

regarding the federal tax refund claim asserted by FDIC-R's July 12, 2011 Proposed Complaint In Intervention.

   In addition, the FDIC-R has alleged sufficient facts therein to show that "it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the [Government]; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

   **2.   Whether The Federal Deposit Insurance Corporation, As Receiver, Requires Independent Article III Standing To Intervene In A Federal Tax Refund Case Before The United States Court Of Federal Claims.**

   The parties also disagree as to the more abstract question of whether the FDIC-R, as a plaintiff-intervenor, must have independent Article III standing to intervene in an action in which the original plaintiff indisputably has standing. *See* 8/25/11 Gov't Resp. at 2-7; TR Omn. Reply at 20-25; Gov't Omn. Resp. at 2-3.

   There is a division among the federal appellate courts on this issue, and it has not been addressed by the United States Court of Appeals for the Federal Circuit to date. *See Landmark*, 256 F.3d at 1382 ("Whether an intervening party must satisfy the case-or-controversy requirement independently of the claims brought by the other plaintiffs is an open question."); *but compare Jones* v. *Prince George's County., Md.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003) ("[P]rospective intervenors in this circuit must possess standing under Article III of the Constitution."); *Mausolf* v. *Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996) (similar); *Solid Waste Agency* v. *United States Army Corps of Eng'rs*, 101 F.3d 503, 507 (7th Cir. 1996) (similar), *with San Juan County* v. *United States*, 503 F.3d 1163, 1172 (10th Cir. 2007) (*en banc*) ("[W]e . . . hold that parties seeking to intervene under Rule 24(a) or (b) need not establish Article III standing so long as another party with constitutional standing on the same side as the intervenor remains in the case." (internal quotation marks omitted)); *Dillard* v. *Chilton Country Comm'n*, 495 F.3d 1324, 1337 (11th Cir. 2007) (similar); *Ruiz* v. *Estelle*, 161 F.3d 814, 830 (5th Cir. 1998) (similar); *Assoc. Builders & Contractors* v. *Perry*, 16 F.3d 688, 690 (6th Cir. 1994) (similar); *Yniguez* v. *Arizona*, 939 F.2d 727, 731 (9th Cir. 1991) (similar); *United States Postal Serv.* v. *Brennan*, 579 F.2d 188, 190 (2d Cir. 1978) (similar); *see also* WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1908 (3d ed.) (2011 Supp.) (discussing the circuit division).

   The United States Supreme Court also has not addressed this division among the federal circuit courts. *See Diamond* v. *Charles*, 476 U.S. 54, 68-69 (1986) ("We need not decide today whether a party seeking to intervene before a District Court must satisfy not only the requirements of Rule 24(a)(2), but also the requirements of Art. III."). Since the court has already determined that the FDIC-R has independent standing, however, it does not need to reach this additional constitutional issue. *Lyng* v. *Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

**C.   Whether Federal Deposit Insurance Corporation-Receiver Is Entitled To Intervene As Of Right.**

Having determined that the FDIC-R is not barred by jurisdictional or standing issues from intervening in this lawsuit, the court has little trouble concluding that it is otherwise entitled to intervene as of right, pursuant to RCFC 24(a).   The FDIC-R has satisfied all of the requirements to intervene as of right.   *See* RCFC 24(a).   First, the FDIC-R has an interest in the subject matter of this lawsuit, because it is seeking a federal tax refund, as alternate agent for the Consolidated Tax Group.   *See Mountain Top Condo. Ass'n* v. *Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir. 1995) ("[A]n intervenor's interest in a specific fund is sufficient to entitle intervention in a case affecting that fund."); *see also* WRIGHT & MILLER § 1908.1 (3d ed., 2012 Supp.) ("A sufficient interest also has been found when the intervenor claims an identifiable interest in funds that are the subject of litigation." (collecting cases)).   Second, the FDIC-R's interests would be impaired by an adjudication of this case without its presence, because a ruling as to the proper basis, if any, for a potential tax refund would preclude FDIC-R from litigating the same issue in a separate proceeding.   *See Anderson Columbia Envtl., Inc.* v. *United States*, 42 Fed. Cl. 880, 882 (1999) ("The potential *stare decisis* effect of a decision often supplies the 'practical impairment' required by Rule 24(a).").   Third, neither the Government nor the Trustee is authorized to protect the FDIC-R's interests.[18]   Finally, there is no dispute that the FDIC-R's Motion To Intervene was timely filed given the need for the FDIC-R to first seek leave from the Bankruptcy Court.   Accordingly, the FDIC-R's July 12, 2011 Motion To Intervene is granted.

---

[18] At oral argument, the Trustee argued that he adequately represented the FDIC-R's interests because he had a fiduciary duty to "put a full court press on both [tax refund] theories." 2/17/12 Hr'g TR at 44.   The court has no doubt that the Trustee will pursue both tax refund theories, but the Trustee, unlike the FDIC-R is motivated to prevail on the Worthless Stock Loss theory.   Therefore, the Trustee cannot adequately protect the FDIC-R's interest in this action. *See, e.g., Trbovich* v. *United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) ("[T]he [adequate representation] requirement of the Rule [24(a)] is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal.").

## V.     CONCLUSION.

For the foregoing reasons, the court has determined that the FDIC-R is entitled to intervene as of right, pursuant to RCFC 24(a), and its July 12, 2011 Motion To Intervene is granted.  The Clerk of the Court is instructed to enter Exhibit A of FDIC-R's July 12, 2011 Motion To Intervene into the docket as FDIC-R's Complaint In Intervention.

In addition, the Government's April 1, 2011 Motion For Joinder is denied as moot.

**IT IS SO ORDERED.**

s/Susan G. Braden
SUSAN G. BRADEN
Judge